**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DANIEL FASSETT and LESLIE FASSETT, husband and wife, individually and as parents and natural guardians of J.F., an minor, | : : : : | No. 4:15-cv-00941 |
| | : | (Judge Brann) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| SEARS HOLDINGS CORPORATION, SEARS, ROEBUCK AND CO., SEARS HOMETOWN AND OUTLET STORES, INC., SEARS AUTHORIZED HOMETOWN STORES, LLC, KENMORE CRAFTSMAN DIEHARD INTELLECTUAL PROPERTY, LLC, BRIGGS & STRATTON CORPORATION, SIMPLICITY MANUFACTURING and KOHLER CO. | : : : : : : : : : | |
| | : | |
| Defendants. | : | |
| | : | |
| And | : | |
| | : | |
| BRIGGS & STRATTON POWER PRODUCTS GROUP, LLC, | : : | |
| | : | |
| Defendant/Third-Party Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BEMIS MANUFACTURING COMPANY, a Foreign Corporation, | : : | |
| | : | |
| Third-Party Defendant. | : | |

**MEMORANDUM**

**January 27, 2017**

1

Some personal injury cases spring from highly questionable circumstances, and others from undeniably life-altering events. Setting aside ultimate questions of liability and damages, this litigation is tragically one of the latter. When Plaintiff Daniel Fassett heard sputtering sounds emitting from his lawnmower, he attempted to relieve the pressure in its fuel tank by loosening the cap. As he did so, gasoline sprayed from the machine onto his body, igniting in flames. Mr. Fassett sustained serious injuries and shortly thereafter initiated this products liability action.

Although the litigation has progressed in a timely fashion since its inception in May 2015, the parties have recently reached a rather technical impasse. That quandary involves, among other questions, the extent to which material about alternative fuel cap designs and distinct lawnmower layouts may be discoverable. In other words, the parties have struggled to define the outer bounds of discovery in this case: what, if anything, can be discovered about parts or mowers not involved in the subject fire? By presenting such a question, this dispute necessarily calls upon the Court to apply the proportionality provision of recently amended Federal Rule of Civil Procedure 26 to the case's technologically nuanced facts.

As explained more fully below, I hold that in a products liability suit such as this one, faithful adherence to amended Rule 26(b)(1)'s renewed proportionality mandate is furthered considerably by implementation of a sliding scale analysis: material corresponding to alternative designs or components that exhibit significant

2

similarities to the design or component at issue should be discoverable in the greatest quantities and for the most varied purposes; however, material corresponding to alternative designs or components that share less in common with the contested design or component should be incrementally less discoverable—and for more limited purposes—as those similarities diminish.

## I.   BACKGROUND

The alleged mechanism by which Mr. Fassett sustained his injuries, though difficult to recount, is central to an appropriate disposition. Mr. Fassett had been operating a Sears Craftsman "Zero Turn" riding lawnmower in May 2013 for about one hour when he heard what he described as "spitting" or "sputtering" in the gas tank. ECF No. 105 at 3. The noise reminded him of the sound of water having seeped into the gas. *See id.* After moving the lawnmower into his garage and turning it off, Mr. Fassett lifted the seat so that he could reach the fuel tank. *Id.* Upon visualizing the tank, he observed that the hissing was coming from underneath the gas cap, and he saw that the gas tank had visibly expanded. *Id.*

In an effort to release what he believed was built-up pressure in the tank, he began to turn the gas cap. *Id.* While the cap rotated, gasoline sprayed from the tank and "doused" his clothes and body. *Id.* As he turned away from the machine to run, the gas cap burst off the tank, and more gasoline sprayed from within. *See id.* Almost immediately, Mr. Fassett "heard the gas ignite and knew he was on fire."

*Id.* Flames covered his back and the left side of his body, traveling as high as the back of his head and portions of his face. *See id.*

Two years later, on May 13, 2015, Plaintiffs filed the instant lawsuit. Averments central to their complaint identified "gas geysering from the mower" and "pressurized gas exploding from the gas tank" as alleged defects. *Id.* at ¶¶ 32, 34, 39. In particular, Plaintiffs brought claims for ordinary and gross negligence, strict liability, breach of warranty, loss of consortium, and negligent infliction of emotional distress. ECF No. 1. On August 28, 2015, this Court granted Defendants' motion to dismiss as to the claims for breach of implied warranties and negligent infliction of emotional distress. *See* ECF Nos. 37–38. Importantly, however, I concluded that a punitive damages claim could survive the motion to dismiss stage, as Plaintiffs alleged sufficient facts plausibly suggesting that the Defendants continued to design, manufacture, and sell the subject lawnmower "despite knowledge of the dangers." ECF No. 37 at 7.

During the spring of 2016, counsel for Plaintiffs brought to the Court's attention what might initially have been described as a percolating discovery dispute. In essence, the parties disagreed about the extent to which material related to gas cap or lawnmower designs other than those specific ones involved in the accident should be discoverable. *See* ECF Nos. 68, 72, 78, 106. The Court held telephonic status conferences on May 5, July 26, and November 9 of that year.

During each conference, I provided the parties with applicable legal citations upon which I would likely rely in reaching a determination and encouraged the parties to attempt to sort out the dispute without further judicial intervention.

After that guidance proved unsuccessful in resolving the pending disputes in their entirety, Plaintiffs filed the instant motions to compel. One motion seeks discovery primarily as to alternative cap designs from Bemis Manufacturing Company, the manufacturer of the gas cap at issue. ECF No. 94. The other seeks similar but more numerous discovery from Briggs & Stratton Corporation and Briggs & Stratton Power Products Group, LLC (referred to collectively as the Briggs & Stratton Defendants), the manufacturers of the lawnmower in question. ECF No. 93. Plaintiffs' motions to compel are granted in part and denied in part in accordance with the reasoning that follows.

## II.   LAW

"It is well established that the scope and conduct of discovery are within the sound discretion of the trial court . . . and that after final judgment of the district court . . . our review is confined to determining if that discretion has been abused." *Marroquin-Manriquez v. I.N.S.*, 699 F.2d 129, 134 (3d Cir. 1983) (Aldisert, J.). "To find such abuse it is usually necessary to conclude that there has been an interference with a substantial right . . . or that the discovery ruling is seen to be a gross abuse of discretion resulting in fundamental unfairness in the trial of the

case." *Id.* Thus, the United States Court of Appeals for the Third Circuit has forewarned litigants that it "will not interfere with a trial court's control of its docket except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant." *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817–18 (3d Cir. 1982) (Aldisert, J.).

"Discovery need not be perfect, but discovery must be fair." *Boeynaems v. LA Fitness Int'l, LLC*, 285 F.R.D. 331, 333 (E.D. Pa. 2012) (Baylson, J.). "The responses sought must comport with the traditional notions of relevancy and must not impose an undue burden on the responding party." *Hicks v. Arthur*, 159 F.R.D. 468, 470 (E.D. Pa. 1995). "[T]he scope of [ ] discovery is not without limits." *Kresefky v. Panasonic Commc'ns & Sys. Co.*, 169 F.R.D. 54, 64 (D.N.J. 1996). As such, "[d]iscovery should be tailored to the issues involved in the particular case." *Id.* As amended Federal Rule of Civil Procedure 26(b)(1) states:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

"To determine the scope of discoverable information under Rule 26(b)(1), the Court looks initially to the pleadings." *Trask v. Olin Corp.*, 298 F.R.D. 244,

263 (W.D. Pa. 2014) (Fischer, J.). In ascertaining which materials are discoverable and which are not, a district court must further distinguish between requests that "appear[ ] reasonably calculated to lead to the discovery of admissible evidence," *Bell v. Lockheed Martin Corp.*, 270 F.R.D. 186, 191 (D.N.J. 2010), and demands that are "overly broad and unduly burdensome." *Miller v. Hygrade Food Products Corp.*, 89 F. Supp. 2d 643, 657 (E.D. Pa. 2000).

"[T]he discovery rules are meant to be construed quite liberally so as to permit the discovery of any information which is relevant and is reasonably calculated to lead to the discovery of admissible evidence." *Fid. Fed. Sav. & Loan Ass'n v. Felicetti*, 148 F.R.D. 532, 534 (E.D. Pa. 1993). "As an initial matter, therefore, all relevant material is discoverable unless an applicable evidentiary privilege is asserted. The presumption that such matter is discoverable, however, is defeasible." *Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000).

Federal Rule of Civil Procedure 37(a)(3)(B) states that "[a] party seeking discovery may move for an order compelling an answer, designation, production, or inspection." "In order to succeed on a motion to compel discovery, a party must first prove that it sought discovery from its opponent." *Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1310 (3d Cir. 1995) (Cowen, J.) (citing Fed. R. Civ. P. 37(a)(1)). In addition, "[t]he party seeking the discovery has the burden of clearly

showing the relevancy of the information sought." *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000).

## III.   ANALYSIS

The starting point is amended Federal Rule of Civil Procedure 26(b)(1). From the outset, I note that the Court is mindful of Defendants' concerns about the mounting expense of unbridled discovery. Nevertheless, I cannot agree with the threshold assertion that what is discoverable is strictly limited to material that is ultimately relevant or otherwise admissible. As the parties well know, Rule 26(b)(1) envisions a broader universe of discoverable material than that. It makes clear, for instance, that "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable."

At the same time, however, "[t]his concept of relevance is tempered . . . by principles of proportionality." *Cope v. Brosius*, No. 4:12-CV-2382, 2016 WL 5871157, at *2 (M.D. Pa. Oct. 7, 2016) (Carlson, Mag. J.). *Accord Stabilus, A Div. of Fichtel & Sachs Indus., Inc. v. Haynsworth, Baldwin, Johnson & Greaves, P.A.*, 144 F.R.D. 258, 265 (E.D. Pa. 1992) ("While the scope of relevance in discovery is far broader than that allowed for evidentiary purposes, it is not without limits.") (internal citations omitted).

As amended Rule 26(b)(1)'s proportionality mandate provides:

Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the

needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Thus, it has been said that the amended rule "restores the proportionality factors to their original place in defining the scope of discovery." *Wertz v. GEA Heat Exchangers Inc.*, No. 1:14-CV-1991, 2015 WL 8959408, at *2 (M.D. Pa. Dec. 16, 2015) (Mehalchick, Mag. J.). *See also Summy-Long v. Pennsylvania State Univ.*, No. 1:06-CV-1117, 2016 WL 74767, at *8 (M.D. Pa. Jan. 7, 2016) (quoting Fed. R. Civ. P. 1) ("[I]t is now unmistakable that the Court and the parties in any federal civil action must constantly strive to resolve unsettled disputes with the ultimate end of a 'just, speedy, and inexpensive determination of every action and proceeding.'").

Considering the factors set forth at Rule 26(b)(1), the parties' access to relevant information is undeniably lop-sided in this case: Defendants are repeat players in this genre of litigation, and they consequently enjoy the benefits of sweeping protective orders. *See* ECF No. 105 at 11–12 n.3. On the other hand, the Plaintiffs lack nearly all avenues other than judicially-sanctioned ones to obtain the requisite records that rest in Defendants' possession.

Moreover, the importance of the issues at stake in the litigation militates slightly in Plaintiffs' favor. Although this is not a case involving, for instance,

constitutional rights or matters of national significance, to these particular litigants, it is a matter of grave import. Further, its outcome may impact the marketability of a widely sold piece of home machinery or some of its components.

Just as important, I believe that the utility of the proposed discovery outweighs its attendant expenses. Certainly, the Defendants can readily produce electronically stored records relevant to the aforementioned models and can engage in a good faith effort to gather whatever data might not have been documented electronically. In the same vein, I am confident that production of the requested material will bear directly upon resolution of the cores issues in this case. It may also clarify any lingering issues as to the most appropriate defendants.

Turning now to Rule 26(b)(1)'s application in product liability cases, the Plaintiffs here allege negligence and strict liability claims, two theories whose proof necessarily entails such questions as: what the Defendants knew or foresaw, *Phillips v. Cricket Lighters*, 576 Pa. 644, 657 (2003); what safety tests they conducted, *Tincher v. Omega Flex, Inc.*, 628 Pa. 296, 313 (2014); and what designs they considered. *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 41 (3d Cir. 2009) (quoting *Habecker v. Clark Equipment Co.,* 36 F.3d 278, 281 (3d Cir.1994) ("The determination of whether a product was negligently designed turns on whether 'an alternative, <u>feasible,</u> safer design would have lessened or eliminated the injury plaintiff suffered.'")).

The touchstone used to distinguish discoverable inputs from others in products liability cases was set forth in *Fine v. Facet Aerospace Prods. Co.,* 133 F.R.D. 439 (S.D.N.Y.1990), and reiterated by this Court in *Horner v. Cummings*, No. 1:14-CV-00639, 2015 WL 4590959, at *4 (M.D. Pa. July 29, 2015) (Saporito, Mag. J.). The *Fine* decision outlined the following test:

> In product liability actions it is frequently difficult to judge which of a manufacturer's products are sufficiently similar to the allegedly defective product to be subject to discovery. Generally, different models of a product will be relevant if they share with the accident-causing model those characteristics pertinent to the legal issues raised in the litigation. For example, where a plaintiff alleged that three-wheel all-terrain vehicles are inherently unstable, he was entitled to discovery with respect to each of the manufacturer's models. *See Culligan v. Yamaha Motor Corp.,* 110 F.R.D. 122, 124, 126 (S.D.N.Y.1986). Similarly, an injured party who contended that the redesigned motor mounts that had failed in his vehicle had not eliminated the defects of earlier models was granted discovery concerning the predecessor versions. *See Swain v. General Motors Corp.,* 81 F.R.D. 698, 699–700 (W.D.Pa.1979). Finally, a plaintiff arguing that the left front spring main leaf on his vehicle failed could obtain discovery regarding all types of vehicles with that component, not merely the identical model. *See Uitts v. General Motors Corp.,* 58 F.R.D. 450, 452 (E.D.Pa.1972) ("*Uitts I*").

*Id.* at 441.

Moreover, the *Fine* court explained that "a plaintiff who raises a design defect claim is entitled to broader discovery than, for example, if the claim were solely one of negligent manufacture," so long as the requested materials "are truly alternatives and that they are potentially safer." *Id.* at 442–43. This does not require the moving party to prove its case on the merits at the discovery stage. *See*

11

*id.* at 443. Instead, this threshold showing might be satisfied by, for example, the affidavit of an expert in engineering. *See id.*

The United States District Court for the Western District of Louisiana, confronted a strikingly similar discovery dispute to the instant one in *Bourque v. CNH America, LLC*. No. 6:10-CV-01347, 2011 WL 4904430, at *2 (W.D. La. Oct. 14, 2011), *aff'd*, No. CIV.A. 10-1347, 2012 WL 393620 (W.D. La. Feb. 6, 2012). The plaintiff in *Bourque* alleged that the gas cap on his tractor's fuel tank spewed gasoline and ignited. *Id.* at *1. Thus, he alleged that the gas cap designs were defective "in that they allowed for 'geysering' of gasoline when pressure built up in the fuel tank due to heating from the engine." *Id.* The defendant contended that material relating to gas gaps of "a different size" were not discoverable, but the court rejected that argument. *Id.* at *2. Instead, it emphasized the underlying claimed defective event (geysering due to pressurization), explaining as follows:

> However, even if the gas cap is of a different size as maintained by CNH, the undersigned cannot find that the information sought can have "no possible bearing" on the claims of the plaintiff given that the same type of event, "geysering," occurred in the same or similar model tractors, with the same or similar fuel systems at about the same period in time as the subject tractor was on the market. If there existed an alternative design that would have prevented the claimant's accident that came about through the recall/Mandatory Modification Program, it may certainly have a bearing on the plaintiff's claims.

*Id.* Acknowledging that the *Bourque* decision was more precisely premised on differences in size rather than differences in design, its inclination toward

functional analysis rather than restrictive, formalistic notions of discoverable material in such cases is well taken.

I will now proceed to consider the particular types of material requested, keeping in mind the factors set forth in Rule 26, including the importance of the discovery to the issues in dispute relative to the expenses that the Defendants would likely incur with production. Although the hallmark factor in my analysis is the extent to which the sought-after discovery shared those relevant characteristics with the accident-causing component, I also weighed several additional factors in arriving at what I determined was the appropriate scope of discovery. Those factors included: (1) the extent to which the contested discovery can achieve the same functionality as the accident-causing part, despite facial design distinctions; (2) the extent to which the contested discovery could be safety tested using the same procedures and standards as would be used for the accident-causing part; (3) whether, compared with the accident-causing part, the contested discovery was an interchangeable component or a distinct system; and (4) the extent to which the moving party has supported its technical assertions with testimony by a witness who possesses adequate knowledge of the design, development, and functionality of the contested components.[1]

---

[1]  This Court's use of the term "accident-causing" is in no way meant as an assignment of fault. Rather, it is merely the way I distinguish the unit or component used by the complainant at the time of the accident from other units or components under consideration.

The first factor—the extent to which the contested discovery can achieve the same functionality as the accident-causing part—speaks, in many ways, directly to the core issue here. In particular, Bemis contends that the only type of gas cap design about which the Plaintiffs may discover information is the open design, because that is the cap design used on Mr. Fassett's lawnmower. Although not outlandish, that suggestion is likely overly restrictive. "[A] party should not be limited by its opponent's theory of the case in determining what is discoverable." *Trask v. Olin Corp.*, 298 F.R.D. 244, 265 (W.D. Pa. 2014) (Fischer, J.).

Of great weight is the deposition testimony of Michael J. Holtz, a corporate designee and the gas cap's product design and engineering manager. *See* ECF No. 105 at 4, 15–20. In addition to the open style vent cap, Mr. Holtz identified three other variations: the screw vent cap, the duckbill cap, and the covered vent cap. *See* Holtz Dep. 17:17–21. Although the three variations are distinguishable from an open vent cap in that they possess different structural designs, all of these caps could function at a partly open setting. *See id.* at 18:06–08; 22:09–13; 26:04–12. In fact, Mr. Holtz testified that each cap was designed to be placed on an open setting while the lawnmower was activated, but closed while it was shut off and being transported. *See id.* at 18:16–18; 22:09–13.

The second factor that I considered was the extent to which the contested discovery could be safety tested using the same procedures and standards as would

14

be used for the accident-causing part. That was true here, and in my view, that fact goes a long way in making the test results as to all of those design caps discoverable. As the reasoning goes, testing using the same protocol makes the results comparable and therefore relevant to such issues as the existence of a safer alternative design and the Defendants' prior knowledge. In fact, as Mr. Holtz explained, his company had previously conducted a type of test that measured airflow through orifices with or without foam baffles. *See id.* at 106:13–24. This protocol could be applied to all free venting caps, including screw, closed, and duckbill designs.

The third factor I considered was whether, compared with the accident-causing part, the contested discovery was an interchangeable component or a distinct system. As to the discovery sought from Bemis, the requested discovery materials are components that could be easily interchanged with the accident-causing parts. Their use on the accident-causing model would not require, for instance, wholesale refurbishing of the entire lawnmower or total replacement of its fuel unit. Barring some surface-level adjustments, distinct fuel cap designs can easily be substituted. This factor is highly relevant in cases such as these: if the various components are readily interchangeable, then the cost of exchanging dangerous parts with safer ones is comparatively low.

The final factor that I evaluated was the extent to which the moving party supported its technical assertions with testimony by a witness who possesses adequate knowledge of the design, development, and functionality of the contested components. Again, as to the Bemis requests, the considerations underlying that factor have been satisfied as by Plaintiffs' citations to the deposition testimony of Michael J. Holtz, a corporate designee and the gas cap's product design and engineering manager.

With that analysis in mind, Plaintiffs' motion seeks the following information from Defendant Bemis:

> [A]ll previously demanded documents, including claims, litigation, warranty, testing data, or any other materials evidencing overpressurization and/or geysering, spewing, fountaining or other hazardous or catastrophic release of gasoline from a tank that has become overpressurized due to inadequate venting. Plaintiffs therefore demand that Kelch/Bemis produce previously demanded documents for any of its free venting caps.

ECF No. 94 at 5 ¶ 17. Because application of all of the aforementioned factors reveals that warranty information, testing data, and any other materials evidencing over-pressurization or geysering corresponding to each of the enumerated free venting caps designs (open, screw, covered, and duckbill) are relevant to a number of Plaintiffs' theories, those materials are discoverable so long as they are not work product. *See Serrano v. Chesapeake Appalachia, LLC*, 298 F.R.D. 271, 277 (W.D. Pa. 2014) ("[E]ven if documents were prepared for a different case, work product

protection may apply as long as the cases 'are closely related in parties or subject matter.'").

My conclusion is different, however insofar as Plaintiffs' requests for claims and other litigation material in all cases involving every variety of the free venting cap. "In products liability cases evidence of prior accidents involving the same product under similar circumstances is admissible to show notice to the defendant of the danger, to show existence of the danger, and to show the cause of the accident." *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 97 (3d Cir. 1983) (Becker, J.). That being said, "[t]he almost universal requirement, however, is that the prior occurrence must involve facts and circumstances which are substantially similar to those involved in the case under consideration or they will be excluded." *Barker v. Deere & Co.*, 60 F.3d 158, 162 (3d Cir. 1995) (Cowen, J.).

At a superficial level, it appears that all of the contested cap designs could be characterized generally as "free venting caps" because they contain a specified orifice that allows air to permeate them in some fashion or another. *See id.* at 107:01–108:02. Nevertheless, based upon Mr. Holtz's characterization of the different cap designs, the screw and covered vent caps appear most like the open vent cap in design and operation, with the duckbill being the most distinct as a consequence of its unique shaping. The notion that information relating to all prior

free venting claims is discoverable because all of those accidents involved failed venting is much too high a level of abstraction.

As for screw, covered, and duckbill caps, the differences in design and what tend to be the distinct factual circumstances render them beyond the scope of discovery. Specifically, each prior claim is capable of differing on a number of grounds: the age and prior history of the lawnmower; whether the lawnmower was a riding or push unit; the period of time for which lawnmower had been running on the date of the accident; the atmospheric conditions at the site of the accident; and the varied actions of the accident victims. In fact, Mr. Holtz recalled that at least one of the prior claims involved a missing gas cap altogether. *See* Holtz Dep. at 14:13–18.

In my view, then, Plaintiffs have not met their burden of showing substantial similarity as to the accidents involving these other designs. Accordingly, although material unprotected by the work product doctrine in prior claims involving the open gas cap design is discoverable, the same is not true of prior claims or litigation involving screw, cover, or duckbill caps.

I consider this outcome to be an amenable compromise between the two overbroad and underinclusive proposals that have been presented. So often, discovery is not properly construed as an all-or-nothing game. Rather, it is a means for uncovering truth—the strengths and weaknesses of one's case—rationally

bounded by efficiency and cost concerns. It is that dynamic that makes discovery a trade-off between knowledge and expenditure. The district court's role under Rule 26, then, is to discern that middle ground between two countervailing pressures, the optimal solution to the information-cost equations. It is my belief that the reasoning outlined above fulfills that dictate.

The parties have also raised a dispute regarding production of privilege logs. Consistent with the foregoing analysis, Defendants shall produce a privilege log detailing with sufficient specificity any items that would be discoverable but for the claiming of a valid privilege or protection. Obviously, Defendants need not log any items that fall beyond the scope of the discovery as detailed herein. Further, work product privilege should not be claimed for performance or testing results that were not truly prepared in preparation for litigation. However, Plaintiffs must also accept that materials shielded by good faith work product claims are likely beyond reach. It is this Court's belief and expectation that this Memorandum and the accompanying Order will sufficiently aid all parties in pinpointing the bounds of discovery and should thereby eliminate the need for subsequent motions to compel on these issues.

I now turn to the discovery requested from the Briggs & Stratton Defendants, those entities responsible for manufacturing the lawnmower at issue. Accordingly, the primary issue as to this subsequent motion is not the similarity of

individual components but that of whole lawnmower units themselves. That being said, the applicable factors are largely similar, allowing, of course, for differences in scale. The motion also raises certain issues as to documents that came to light in connection with recent depositions.

Plaintiffs' first two requests deal with field and pressure testing documents relating to the fuel tank or gas cap used on the instant lawnmower model or on any of Defendants' other products. I tend to agree with the Defendants, however, that Plaintiffs fail to provide any information as to what constitutes a similar or comparable mower to the one at issue. *See* ECF No. 110 at 6. According to the Briggs & Stratton Defendants, they have already provided or are in the process of providing documentation for four other lawnmowers that share similar characteristics with Mr. Fassett's mower. *Id.* Those models are the Simplicity Axion, the Snapper 150Z, the Craftsman ZT7000, and the Craftsman ZT75000. *Id.*

In persuasive fashion, those Defendants explain that the lawnmower models they selected "have the same gas cap, same tank, same frame, the same engine/gas tank layout, and the same heat shielding." *Id.* at 6–7. In my view, those are particularly useful decision metrics for a district court sitting in precisely this discovery posture. In fact, were I to compile a list of factors similar to that above, it would necessarily include such inquiries as: (1) whether the product shared the same accident-causing component; (2) whether the product shared the same

general layout as the defective product; (3) whether the product is the same general type of equipment as the defective product; (4) in fire cases, whether the product's heating, shielding, and exhaust systems are similar to that of the defective product; and (5) whether the moving party has supported its motion with effective technical testimony as to these similarities.

"[W]here there has been no suggestion that the other models share pertinent characteristics with the products at issue, discovery relating to those models will be disallowed." *Horner*, 2015 WL 4590959, at *3–4 (quoting *Fine*, 133 F.R.D. at 441–42 (S.D.N.Y.1990)). "[S]uch a showing could have been made, for example, through the affidavit of an expert in [ ] engineering." *Fine*, 133 F.R.D. at 443.

In essence, the parties dispute whether having the same gas cap, tank, frame, and general layout are pertinent characteristics for "similar" products. I believe that in a case such as this, where the alleged injuries stemmed from the geysering and ignition of gasoline, similar products must share those attributes with the accident-causing product. This appears to be the case for several reasons: the layout and the frame dictate both the proximity of the tank to heat-emitting components and the space available for expansion of the gas tank. They control how easily the tank and cap may be accessed, or conversely, to what extent those parts are exposed. In my view, they also influence the likelihood of fire, given that they determine the closeness of the fuel cap and any attendant gasoline spills to the components of the

21

lawnmower that are typically heated, such as a muffler or other exhaust component.

Plaintiffs' first two requests, as enumerated in their proposed order, seek discoverable material on "any other of Defendants products." An affidavit filed by a Briggs & Stratton representative indicates that this request could reasonably be read to include upwards of one hundred products. *See* ECF No. 110 at 9 (citing Petraszak Aff.). I therefore agree that Plaintiffs' first two discovery requests of the Briggs & Stratton Defendants are overbroad, unsupported by sufficient technical backing, and out of proportion with the needs of this case.

The Briggs & Stratton Defendants should produce or continue to produce only those non-privileged records associated with the Simplicity Axion, the Snapper 150Z, the Craftsman ZT7000, and the Craftsman ZT75000. They have also indicated that they are producing similar documents that correspond to the Coronet model, which documents they should also continue to produce. *See* ECF No. 110 at 7. Accordingly, Defendants need not produce those documents requested in Categories 1 and 2, except and to the extent that they pertain to the five lawnmower models identified above.

Plaintiffs' Category 3 request seeks information relating to the Dortch/Reaves, Oliff, Milner, Reynolds, Steve Johnson, Timothy Johnson, James Thomas, O. Alexander, Ron Sheets, or Earl Vinson mowers and lawsuits,

including all prior warranty claims. ECF No. 93 Ex. 2 at 1. The Category 4 request

seeks all "In Depth Investigation" (IDI) records from the Briggs & Stratton

liability claims system. Consistent with my prior reasoning, those requests are

denied, except and to the extent that any of the previously named actions or

requests involved any of the five enumerated lawnmower models about which

material has been deemed discoverable (the Simplicity Axion, the Snapper 150Z,

the Craftsman ZT7000, the Craftsman ZT75000, and the Coronet). To the extent

that the Defendants believe that any of these materials are protected by the work

product doctrine or other rule or privilege, a log setting forth those protections in

good faith and with sufficient specificity should be provided to counsel for

Plaintiffs.

The next two requests (Categories 5 and 6) seek releases obtained by

Thomas Wise, a Briggs & Stratton products safety and compliance manager,

including drafts and any markups by Mr. Wise related to claims of venting

clogging of fuel caps, fires, or near misses, as well as cover letter or cover email

communications between Mr. Wise and claimants/owners from whom Mr. Wise

obtained releases regarding such claims. *See* ECF No. 93 Ex. 2 at 2. These

documents are beyond the scope of discovery, pursuant to Federal Rule of

Evidence 408, which bars the introduction of evidence of offers or statements

(accepted or otherwise) made in the settlement context when such evidence is offered to prove, among other things, "the validity . . . of a disputed claim."

Though the Plaintiffs contend that such material would be admissible for the alternative purpose of establishing the Defendants' knowledge, I cannot agree that the claimed admissible purpose is readily extricable from the inadmissible ones. I also remain wary of piercing the sanctity of settlement negotiations for fear that doing so would discourage extrajudicial resolution in future cases. This is particularly true where, as here, the Plaintiffs also have the opportunity to establish prior knowledge through a number of parallel avenues, such as internal testing and reports. Likewise, as Defendants point out, "numerous factors play a role in parties' decisions to settle claims, including risks and expenses of litigation, a party's policy towards settlement, and the confidentiality assured by settlement." ECF No. 110 at 13. This is an eerily similar observation to one that this Court recently made in a matter involving a good faith insurance claim:

> [C]overage of some claims and denial of others is not per se evidence of bad faith [ ] practices. For example, consider a hypothetical set of five claims, all of which are "similar" but none of which the insurer believes in good faith it is legally bound to offer coverage. The insurer could, if it wanted, offer coverage in none or all or two or three of those cases. Denial would not be made in bad faith under the law. Rather, it would be made based upon a calculated business judgment, risk avoidance, litigation forecasts, etc. The point is that "similarity" among claims is a poor predictor of bad faith denials in cases where either the claims' alleged similarity or the claims' coverage under the policy is not clearly established.

24

*Westfield Ins. Co. v. Icon Legacy Custom Modular Homes*, No. 4:15-CV-00539, 2016 WL 4502456, at *8 (M.D. Pa. Aug. 29, 2016). Given the relatively low need for the material, their highly confidential nature, and their tendency to lack in probative value, the Category 5 and 6 requests are therefore denied.

A related request is Category 7, which seeks records of the claims review/warranty trend meetings with or claims personnel. Defendants suggest that these items were not requested in Plaintiffs' initial requests for production. That being said, I believe the initial requests were sufficiently broad enough to put Defendants on notice these materials would be sought. In addition, the fact that certain documents were disclosed comparatively late or raised for the first time during recent depositions also confirms for me that these records should likely be discoverable. Accordingly, Plaintiffs may obtain the Category 7 information, subject to the earlier limitation set as to the five enumerated models, as well as any valid claim of privilege or related protection.

Category 8 seeks the Defendants' purchase order file for the gas cap that was used in the accident-causing mower. According to the Defendants, it is unable to locate that file. ECF No. 110 at 14. I would encourage the Defendants to engage in a reasonably broad search, but absent the requisite showing of bad faith destruction or failure to preserve, I do not believe there is much for the Court to contribute as to this request.

Category 9 seeks claims, warranty, or other litigation files for the Coronet riding lawnmower. Defendants attest that they have already provided all of the warranty claims for the gas cap that was on the Coronet lawnmowers and are attempting to locate any claims files or litigation involving a Coronet lawnmower under similar circumstances. *See id.* at 14. The Court encourages the Defendants to complete those productions, subject to the standard disclaimers reiterated throughout this Memorandum.

Category 10 requests the production of materials for all Briggs & Stratton gasoline engine products, whether they be lawnmowers, snowthrower, leafblowers, etc. For the reasons set forth above, I believe those requests are overly broad. Layout, frame, and other design specifications are critical to the propensities to heat and ignite in a case such as this, and even despite generalized similarities as to fueling, the entirely distinct patterns of usage among various power tools therefore render adequate comparison suspect as a matter of law. If similarity in fueling systems was the proper guideline for this Court to follow, it would seem exceptionally difficult to exclude just about any power tool from the scope of discovery. The line must be more acutely drawn than that. As such, the Category 10 request is denied, as Plaintiffs' discovery is appropriately limited to the five lawnmower models enumerated above.

Another issue central to this discussion is the proper temporal scope of discovery. In particular, Plaintiffs' proposed order seeking discovery from Bemis requests discovery from as early as 1970. Mr. Fassett purchased the subject lawnmower on or around March 2, 2007, ECF No. 1 at 6 ¶ 18, and the Defendants approximate that this particular mower was manufactured between February 16, 2005 and June 29, 2005. ECF No. 110 at 2. As such, requiring the production of documents dating back to the 1970s would appear excessive in comparison with the needs of the case. As the Honorable Richard A. Posner of the United States Court of Appeals for the Seventh Circuit has described this dynamic generally:

> In most suits against corporations or other institutions, and in both *Twombly* and *Iqbal*—but also in the present case—the plaintiff wants or needs more discovery of the defendant than the defendant wants or needs of the plaintiff, because the plaintiff has to search the defendant's records (and, through depositions, the minds of the defendant's employees) to obtain evidence of wrongdoing. With the electronic archives of large corporations or other large organizations holding millions of emails and other electronic communications, the cost of discovery to a defendant has become in many cases astronomical. And the cost is not only monetary; it can include, as well, the disruption of the defendant's operations. If no similar costs are borne by the plaintiff in complying with the defendant's discovery demands, the costs to the defendant may induce it to agree early in the litigation to a settlement favorable to the plaintiff.

*Swanson v. Citibank, N.A.*, 614 F.3d 400, 411 (7th Cir. 2010) (Posner, J., dissenting) (internal citations omitted). Thus, other courts have noticed that the lack of reasonable temporal bounds in a discovery request may render it "abusive"

and "facially objectionable." *N.U. v. Wal-Mart Stores, Inc.*, No. 15-4885-KHV, 2016 WL 3654759, at *5 (D. Kan. July 8, 2016).

"[R]elevant information, which is otherwise discoverable, may be limited both 'geographically' and 'temporally' in order to avoid overly broad and unduly burdensome requests." *Briddell v. Saint Gobain Abrasives Inc.*, 233 F.R.D. 57, 60 (D. Mass. 2005). "Thus, the task of the trial court is to balance the clear relevance of the information against the burden on the defendant." *Owens v. Sprint/United Mgmt. Co.*, 221 F.R.D. 649, 655 (D. Kan. 2004). Though the appropriate bounds will vary depending on the specific circumstances of each case, courts in this Circuit have often taken the default position of limiting discovery to no earlier than five years from the date on which the allegedly tortious conduct occurred. *See Grayson v. Dewitt*, No. 1:15-CV-453, 2016 WL 5801699, at *6 (M.D. Pa. Oct. 5, 2016) (Carlson, Mag. J.) (citing *Miller v. Hygrade Food Prod. Corp.*, 89 F. Supp. 2d 643, 657 (E.D. Pa. 2000) (collecting cases)).

I find this tendency to follow the so-called "five-year rule" instructive, though I would modify it slightly for its application in the products liability setting. In regard to such lawsuits where a defendant is alleged to have knowingly designed, manufactured, or sold a defective product when safer, feasible alternatives existed, I hold that the temporal bounds of discoveries should be set

28

not from the date of the accident but from the time period during which the product was manufactured and sold.

I believe that this determination rightly conforms to the nature of such actions. For instance, the tortious conduct is more properly construed as having occurred at the point of defective manufacture, design, or sale than at the point of injury. Further, a plaintiff should be able to gather information regarding a defendant's decision-making process, as the propriety of that risk-utility analysis occupies the core of such disputes. However, each case will present its own unique circumstances, and a defendant's showing that its production lines, components, or designs have materially changed during that same timeframe would perhaps justify a narrower tailoring of the discovery period.

Nevertheless, the timeline here is relatively clear: the lawnmower was manufactured sometime in the spring of 2005; it was purchased in 2007; the accident occurred in 2013; and this suit was filed in 2015. I will extend the discovery period to five years from the approximate time of its manufacture, thereby limiting the discovery of information and material relating to the manufacture, design, or sale of the subject lawnmower or its parts (or those comparable models and parts) to no earlier than January 1, 2000. *See also N.U.*, 2016 WL 3654759, at *1 (limiting discovery to no earlier than 2008 in a products lability case involving children's clothing that caught fire and was sold in Wal-

29

Mart stores during the 2012-2013 timeframe); *Bates v. Michelin N. Am., Inc.*, No. 1:09-CV-3280-AT, 2012 WL 453233, at *2 (N.D. Ga. Jan. 13, 2012) (restricting discovery in products liability case to "a four year period surrounding the date the [defective] tire was manufactured"); *Gassaway v. Jarden Corp.*, 292 F.R.D. 676, 682 (D. Kan. 2013) (upholding a discovery request seeking information from as early as 2000 to 2003 about an allegedly defective heater eventually purchased in 2009).

As to an unrelated issue, Plaintiffs also request that their papers be unsealed. Because Plaintiffs' briefing contained direct excerpts from party depositions, out of an overabundance of caution and in what might be an excessive showing of deference toward the parties' stipulated protective order, my preference is to leave those documents sealed at this time. Moreover, I believe that this Memorandum itself, which need not be sealed, serves a commensurate public purpose while simultaneously avoiding any disclosure as contemplated by the protective order. *See Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787 (3d Cir. 1994) (Cowen, J.). I also will point out for the record that the Defendants themselves elected not to seal their own papers after raising the issue with the Court in the first place.

Finally, I would caution that the purpose of this Memorandum is solely to resolve the instant discovery dispute and not to assess liability. Specifically, nothing herein should be read as concluding that the subset of similar components

or designs for the purposes of discovery is coterminous with that subset of feasible alternative components or designs for the purposes of a merits determination. In fact, strong arguments can likely be made that merely as a consequence of the breadth of discovery, the former subset is typically more populous than the latter.

## IV.   CONCLUSION

Consistent with the foregoing reasoning, Plaintiffs' motions to compel are granted in part and denied in part. An appropriate Order follows, which enumerates my rulings by motion and by individual requests. That Order also includes renewed case management deadlines.

BY THE COURT:

s/ Matthew W. Brann
Matthew W. Brann
United States District Judge